Filed 5/12/22  In re M.M. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.M. et al., Persons Coming Under the Juvenile Court Law. | B311078 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  Ma.M.,  Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 20CCJP03454A, 20CCJP03454B, 20CCJP03454C |

APPEAL from orders of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

The juvenile court declared mother Ma.M.'s children dependents and removed them from her custody after finding she was involved in several domestic violence incidents with her former boyfriend. During the most recent incident, one of the children intervened and started hitting the boyfriend. On appeal, mother contends there is insufficient evidence supporting the court's removal orders and there were reasonable means to protect the children short of removal. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 2020, the Los Angeles Department of Children and Family Services (DCFS) received a referral alleging mother's boyfriend emotionally abused her two children, eight-year-old M.M. and six-year-old J.M. During DCFS's investigation of the referral, it discovered mother has a long history of domestic violence with multiple partners. Several years earlier, M.M.'s father severely beat mother and threatened to kill her and her children. After ending her relationship with M.M.'s father, mother started a relationship with J.M.'s father, which also involved domestic violence.

Mother began a relationship with H.W. (father)[1] in September 2019. A couple of months later, in November 2019, mother called the police because she was concerned he would become physically aggressive during an argument. Father told mother her family was going to miss her, which she interpreted as a threat to her life.

---

[1] We refer to H.W. as "father" because he is the father of mother's other child, J.W., with whom she was pregnant at the time of the referral.

That same month, mother enrolled in therapy to address past domestic violence and current trauma. Mother had previously completed group counseling while living at a domestic violence shelter.

Mother and father had another domestic violence incident in March 2020. According to a police report, mother and father had a verbal fight about father's relationship with another woman. Father became aggressive and threw papers at mother, striking her in the face. He then grabbed mother by the collar with both his hands and pressed his knuckles into her jaw, causing her pain. He repeatedly shoved mother against a wall, causing her to hit her head and shoulders.

Mother told the police that father previously pushed her onto a bed and held her there by her wrists and neck. According to mother, father had also threatened to use or used a weapon against her, threatened to kill her, and attempted to smother, strangle, or suffocate her. Mother requested an emergency protective order against father because she was worried he would retaliate against her for filing a police report.

During her initial interview with DCFS on May 18, 2020, mother said she was pregnant with father's child, but they were not currently in a relationship. Mother insisted she was not fearful of father and did not believe he would hurt her. When confronted with evidence showing she previously called the police on father, Mother claimed she " 'jump[ed] the gun' " by doing so. Mother assured the social worker that, given her past experiences with domestic violence, she would not continue in a domestic violence relationship in the future. She believed the current referral was retaliation because she and father filed a complaint against a DCFS case worker and supervisor in a

child welfare case involving father's other child. That case also involved domestic violence by father.

About two weeks later, on May 30, 2020, mother called the police because father showed up at her apartment complex and refused to leave. A social worker advised mother to consider obtaining a restraining order against father.

Mother and father were involved in another domestic violence incident a few days later. According to mother, on June 3, father asked to stay at her apartment, but she refused. Father responded by taking mother's phone and purse, and she eventually agreed he could stay at the apartment while she took the children to a birthday party. On the way home from the party, mother learned that father had cheated on her.

When mother arrived home with the children, she and father had a verbal argument. At some point, Mother pushed father's face with an open hand. Father held mother's arms in a way she felt was " 'too hard,' " and he shoved her onto a bed. J.M. jumped on father's back and started hitting him. Father took J.M. and placed him on the bed. Mother tried to get her cell phone, but father bit her arm. M.M. came into the room and yelled at father to stop.

Mother and the children told father to leave, but he refused. Mother threw a shoe and plastic bottle of mayonnaise at father, and he shoved her onto the couch. Father squeezed mother hard, causing her to scream for help. The children became upset and yelled at father to leave. Father finally left the apartment when mother started to call the police. Mother filed a police report and requested an emergency protective order against father.

While discussing the incident with a social worker, Mother said she did not mean to " 'paint the image that [father] is a bad person because I know he is not violent and that he really is a good man.' " Nevertheless, she agreed to request a temporary restraining order (TRO). A few days later, she said she no longer needed a restraining order, and she did not want to go through her pregnancy without father. Mother, however, changed her mind again, and she filed a request for a TRO on June 11, 2020. She listed herself and her children as protected persons.

J.M. told a social worker that during the June 3 incident, father pushed mother and she " 'fell slowly' " into a closet. J.M. said he had to defend mother, and he had previously thought about hitting father and " 'throw[ing] him off the house.' " According to J.M., mother and father had 10 previous incidents of violence. One time, father cut his wrists with scissors after mother locked him out of the apartment. J.M. said he was "a little afraid" of father and did not want him to return to their home. Mother, however, told J.M. that father would be coming around again because of the baby.

M.M. told a social worker there had been four previous altercations between mother and father. One time, M.M. was in a car with mother while father was driving another car. Father was angry and " 'smashed' " mother's car. M.M. said he " 'won't let [father] hurt [mother] again,' " and he would push father if he tried to beat her.

On June 22, 2020, DCFS received information that mother continued to allow father in her home and around her children. Mother initially denied doing so, but she eventually admitted it. Mother said she and father had been getting along, and she and the children missed him.

5

Two days later, on June 24, 2020, the court granted DCFS's request to detain the children. While preparing to serve the order, a DCFS social worker saw mother and the children walking toward father, who was outside mother's apartment complex. The social worker later saw mother preparing to get into a car with father. When the social worker told mother about the detention order, mother lied and said the children were not at home. DCFS detained the children and placed them with a non-relative.

On June 26, 2020, DCFS filed a petition to declare J.M. and M.M. dependents under Welfare and Institutions Code section 300, subdivisions (a) and (b).[2] The petition alleged mother and father have a history of engaging in violent verbal and physical altercations, which endangered the children's physical health and safety and placed them at risk of serious harm.

In July 2020, Mother told DCFS she had enrolled in a domestic violence program. She claimed she had not had contact with father since June 11, 2020, when she obtained the TRO. She said she believed DCFS detained the children because she filed complaints in a separate case involving father's other child.

The family court denied mother's request for a domestic violence restraining order on August 28, 2020. Around that time, mother stated she was spending more time living with her niece in order to avoid father.

Mother gave birth to J.W. in November 2020. After doing so, she became seriously ill and was placed in a medically-

---

[2] Future undesignated statutory references are to the Welfare and Institutions Code.

induced coma. Mother eventually recovered and moved in with her niece. She planned to move to the Barstow area to be further away from father.

On November 25, 2020, a family friend told DCFS that she, mother, and father had dinner together about a month earlier.

About a week later, DCFS filed a petition to declare J.W. a dependent under section 300, subdivisions (a), (b), and (j). The petition alleged mother and father's history of domestic violence placed the child at risk of harm (counts a-1, b-2, j-1), and mother could not care for the young child due to her medical condition (count b-1).

On January 4, 2021, father told DCFS he continued to have ongoing contact with mother. Mother denied father's claim. A few days later, however, she admitted contacting father because she was upset with him.

The court held a combined jurisdiction and disposition hearing on February 17, 2021 related to all three children. On J.W.'s petition, the court sustained a single count under section 300, subdivision (j), related to mother and father's domestic violence.[3] On J.M. and M.M.'s petition, the court sustained both counts under section 300, subdivisions (a) and (b).

As to disposition, mother argued there were reasonable means to protect the children in lieu of removal, such as unannounced visits by DCFS. DCFS urged the court to instead remove the children from mother's custody in light of her long history of domestic violence and failure to demonstrate an understanding of its severity and the risk it posed to her children.

---

[3]  The court dismissed counts a-1, b-1, and b-2.

The court declared all three children dependents and removed them from their parents' custody. The court noted that returning the children to mother's custody would be detrimental because mother "continues to involve herself in [domestic violence] . . . and does not have any insight in programing." The court ordered mother to participate in parenting classes, a domestic violence support group for victims, individual counseling, and conjoint counseling with father if they intended to reconcile.

Mother timely appealed. On appeal, she challenges only the court's dispositional orders removing the children from her custody.

## DISCUSSION

### 1. *Mother's appeal is not moot*

While this appeal was pending, the juvenile court returned mother's children to her custody.[4] In light of those orders, DCFS urges us to dismiss mother's appeal as moot. We decline to do so.

"An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054.) "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.) An appeal is not moot if the purported error could negatively affect the appellant in future proceedings. (See *In re J.K.* (2009)

---

[4]      On January 11, 2022, we granted DCFS's request to take judicial notice of the juvenile court's August 18, 2021 minute orders returning the children to mother's home. (Evid. Code, § 452, subd. (d).)

8

174 Cal.App.4th 1426, 1432; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)

Mother argues her appeal is not moot because the court's removal orders could negatively affect her in future dependency proceedings related to the children. Specifically, she argues that because the time limits for reunification services run from the date the court first removes a child, if the court were to remove the children from her custody again, she would not be entitled to additional reunification services. (See § 361.5, subd. (a)(1) [a parent is generally entitled to 6 to 12 months of reunification services]; *In re T.W.* (2013) 214 Cal.App.4th 1154, 1158 [the time limits for services set forth in section 361.5 become operable when a child is removed from the custody of both parents at a disposition hearing].) In light of this possibility, and out of an abundance of caution, we will consider mother's appeal on the merits.

**2.** ***Substantial evidence supports the court's removal orders***

To remove children from parental custody, the juvenile court must have clear and convincing evidence that there is or would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if returned home, and there are no reasonable means to protect the children's physical health without removing them from the home. (§ 361, subd. (c)(1).) Generally, a jurisdictional finding alone is not prima facie evidence the child cannot remain in the parent's physical custody. (*In re E.E.* (2020) 49 Cal.App.5th 195, 217–218.) In determining whether to remove the child, the court may consider the parent's past conduct and current circumstances, as well as the parent's response to the conditions

9

that caused the juvenile court to intervene. (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) The parent need not be dangerous, and the child need not have suffered actual harm, before removal is appropriate. (*Id.* at p. 328.)

Our Supreme Court recently clarified the standard for appellate courts to use when reviewing findings that must be proved by clear and convincing evidence. In such cases, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996; see also *In re Jasmon O.* (1994) 8 Cal.4th 398, 423.) The appellant has the burden of showing there is insufficient evidence to support the juvenile court's findings or orders. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Here, the evidence shows mother and father were involved in numerous violent altercations, some of which occurred in the children's presence. Mother reported that father threatened to use or used a weapon against her, threatened to kill her, and attempted to smother, strangle, or suffocate her. In March 2020, father struck mother in the face with papers, grabbed her by the collar, pressed his knuckles into her jaw, and repeatedly shoved her against a wall. In June 2020, he shoved mother onto a bed and couch, held her down, squeezed her tightly, and bit her arm

10

as she reached for her phone. During the incident, J.M. tried to protect mother by jumping on father's back and hitting him, and M.M. yelled at father to stop. According to M.M., on another occasion, father caused a collision with mother's car while the child was a passenger. Both children, moreover, indicated they would intervene if father used violence against mother in the future. As mother seems to concede, exposure to father's violence clearly poses a serious threat to the children's health and well-being. (See *In re Cole L.* (2021) 70 Cal.App.5th 591, 603 [noting there is a risk of harm to a child "if a father strikes an infant's mother while she is holding the child or an older child intervenes during a fight to protect her mother from her father's abuse"]; *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [spousal abuse is detrimental to children, even if they are not physically harmed].)

Mother nevertheless insists the court erred in removing the children from her custody because there is no evidence showing they are at risk of exposure to further domestic violence. According to mother, although she demonstrated poor judgment in the past, the record shows that as of the disposition hearing, she was serious about keeping her distance from father. In support, she points to evidence showing she was participating in a domestic violence program and counseling, she attempted to obtain a restraining order against father in August 2020, she moved in with her niece to avoid father, and she was actively searching for alternative housing further away from father.

While mother's efforts are commendable, the juvenile court could have reasonably concluded they were not sufficient to eliminate the risk of harm to the children. The evidence shows mother has a long history of domestic violence in her relationships, including with all three of her children's fathers.

11

She also has a long history of participating in services to address those issues, which clearly were not successful. Indeed, even after completing group counseling while living at a domestic violence shelter and participating in therapy to address domestic violence in November 2019, mother was involved in at least two serious incidents of domestic violence with father, one of which directly involved her children. Mother also displayed a severe lack of insight, as she repeatedly lied to DCFS about father's violence and her contact with him, denied that father was a violent person despite overwhelming evidence to the contrary, and insisted the dependency case was retaliation by DCFS for her complaints in another matter. While it is true mother subsequently participated in more services, given her history, the court could have reasonably concluded such participation alone was not enough to alleviate the risk to her children.

That mother filed for a protective order against father, moved in with her niece, and was searching for other housing also do not conclusively show there was no longer a risk to the children. Mother had previously requested protective orders against father, yet she consistently resumed contact with him and continued to allow him to be around her children. The evidence also shows mother continued to have contact with father after moving in with her niece. A family friend told DCFS she had dinner with mother and father sometime around October 2020, and Mother admitted contacting father in January 2021. On this record, the juvenile court could have reasonably concluded mother is likely to continue to have contact with father, which places the children at risk of harm. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior."].)

We also reject mother's contention that the court's exercise of jurisdiction was sufficient to protect the children. Mother insists that, once the court took jurisdiction, she had an incentive to comply with its orders so she could maintain custody of the children. While true, mother had similar incentives throughout the dependency proceedings, yet continued to have contact with father and minimize the extent of his domestic violence.

Mother alternatively argues the juvenile court failed to consider reasonable means to protect the children without removing them from her custody, such as a no-contact order with father and unannounced visits by DCFS. She points out that, although the court's minute order states it found there are no reasonable means by which the children could be protected without removal, the court did not actually discuss any alternatives at the hearing.

Contrary to mother's suggestions, section 361 does not require a juvenile court to discuss alternatives to removal on the record. The court, moreover, implicitly rejected any such alternatives when it found mother's domestic violence history and lack of insight created a risk of harm to the children if returned to her home. (See *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, disapproved of on other grounds by *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6 [a court necessarily considered and rejected an alternative to removal when it found the child could not safely be returned to her mother's custody].) There is also substantial evidence to support those implied findings. The court, for example, could have reasonably determined a no-contact order would not be sufficient given mother previously ignored protective orders against father. The court also could have found unannounced

13

visits would not be sufficient given father's contact with mother and the children was sporadic. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [unannounced visits can only assess the situation at the time of the visit].)

Under these circumstances, substantial evidence supports the juvenile court's conclusion that the children could not be adequately protected in mother's custody.

## DISPOSITION

We affirm the juvenile court's orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

KIM, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.